All rise. The United States Court of Appeals for the Ninth Circuit is now in session. I think it's still good morning, so I'll say good morning. I want to thank counsel for helping us on this remote hearing. I'm Judge Gould, and I'm presiding judge. I'm sitting with Judge Christin, who's in Anchorage, and with Judge Blaznik, who is in Seattle, and graciously donated some time from his busy district court schedule. And we're all happy to be here with my counsel, Judge Gould. I think this first argument is set for 15 minutes, and for the appellant. Is it Mr. Mann? Yes, it is. You're on. Mr. Mann, thanks for your patience, and we now proceed with the appellant's advocacy. Well, I hope it measures up to that standard, Your Honor. I am Mark Maron, representing the plaintiff's appellants in this case, and that's Robert Mann and his sisters Vern and Deborah Mann. And may it please the court. The First Amendment, as this court has recognized and stated, protects relationships involving marriage, child rearing, and cohabitation with relatives. The First Amendment under Rotary may also protect relationships which have objective characteristics, which demonstrate the relationship is sufficiently personal or private to warrant constitutional protection. The relationship which plaintiffs, three siblings of Joseph Mann, had with their deceased brother qualified for protection under both categories identified by the Supreme Court in Rotary. First, cohabitation, meaning to live with. Joseph lived with his brothers, with his brother Robert and sisters Vern and Deborah at the time of his death. He did not reside with anyone else other than those three siblings. And when permitted by the court on remand to plead additional facts describing the nature of their relationships with their brother, they stated that right up until his death, Joseph lived with them, alternating among their three homes, but staying primarily with Robert Mann. He kept his clothes and personal belongings at his siblings' homes. He got his mail at Robert's home. He listed their residences as his own. This is cohabitation. These allegations are sufficient to satisfy the requirement of cohabitation, and the First Amendment complaint should not have been dismissed on that ground. But plaintiffs also described the nature of their relationship with their brother in terms which fulfill the requirement that as an alternative to cohabitation, they established that they had a sufficient personal or private relationship to warrant constitutional protection. In paragraphs 13 through 35 of their First Amendment complaint, they described the close family relationship they had with their brother, their shared religious beliefs going back to the time that they were children. They described the close family relationships they had in many other respects, including that Joseph demonstrated his family devotion by returning to Georgia when his mother was critically ill in 2009 and returning after her death in 2012, moving back in with Robert, although frequently he spent time with Robert together with his sisters Vern and Deborah. He was showing signs of mental illness, however, and addiction. And Robert arranged for Joseph to attend alcoholic anonymous and narcotics anonymous meetings and actually went to those meetings with him. Until his death, plaintiff siblings supported Robert financially, took care of him, fed him, even though he was suffering mental illness. Siblings found him when he stayed out at night, sometimes for several nights, and they brought him home to them. They stayed in daily contact with him. Now, maybe this relationship was a little different because of his mental illness and because of his addictions, but it was a close, loving, personal sibling relationship. These are facts which plaintiffs pled, believing that they were sufficient to show that close, loving, concerned, supportive and intimate, which warrant constitutional protection. Rotary notes that determining whether a relationship merits protection unavoidably entails a careful assessment of where that relationship's objective characteristics located on a spectrum from the most intimate to the most attenuated of personal relationships, personal attachments. This is not the type of careful assessment which can be done on a court ruling on a 12b6 motion to dismiss. It's certainly better suited to a motion for summary judgment after facts have been developed, where the facts can be fully stated and explored, or better yet, for trial where the jury can determine if the relationship really was deep and committed and intimate. Cohabitation as a term is essentially a stand-in for intimate relations, which can be shown by other evidence and which will vary from case to case. Counsel? Yes, Your Honor. Excuse me for interrupting, but what would be most helpful to me, I can have two specific questions, and I'd like to get them out if I could. One is, in addition to rotary, what is the case law that most directly supports your position that constitutional right attaches here? Should I listen for the second question or just respond to the first, Your Honor? Well, the second question is going to be the extent to which your case depends upon a finding of cohabitation. Well, I think that there are very few cases that give us strict guidance. I've just lost the video feed. I don't know if you can still hear me. I can hear you just fine. Okay, well, it'll be as if I'm on the telephone then because I can't see the court. So there are very few cases. The district courts mainly have struggled with or even assumed that the relationship that they're considering is adequate or sufficient. We had the Cower case here where siblings were permitted to proceed in a case very similar to the case before us where their brother was shot by police and killed. We have certainly the Graham case, which dealt with another type of relationship, a fiancé. We have Lee, which under the First Amendment allowed a mother to sue under 1983 for interference with her relationships with her son. And I think this court has recognized essentially this is a case of first impression for the Ninth Circuit. We have Ward, which gave us some guidance by saying that the 14th Amendment was not the place for siblings to litigate their standing or to press their entitlement. But I think that we have to look primarily at Rotary and Roberts for the guidance from the Supreme Court, and their guidance is quite explicit. And I think if we follow that, we have to land in a place which allows First Amendment protection for siblings who demonstrate a close relationship if they're not cohabitating. The difficulty I have is that Rotary or Roberts, you know, the Jaycees, are dramatically different factual settings than what we're talking about here. And so I think what I get from those cases is what doesn't qualify. And hence my second question. When we're talking about adult siblings, much is written there about cohabitation. So that really gets to my next question. When we're talking about adult siblings and not a large professional organization like Rotary, do we have to find cohabitation? Well, I don't believe we do have to find cohabitation. I think that what is protected is the intimate relationship. And for instance, if you had, let's say, two siblings who lived in the same home and one was killed by the police, then under our existing law, there's no question but that that sibling, as a cohabitant, would be able to maintain a case under the First Amendment. But why should it be any different if that sibling were living in a trailer out back of the family home or even in the home next to it? So it just shows that cohabitation itself, while it sounds like a good bright line, doesn't really answer the question. What we're really looking for is the protection of those intimate relationships. Counsel, Judge Gould, if I could interject a question, please. I know you probably want to save some time for a bottle and if we use all your time up with our questions, we'll give you an extra minute or two for that. Thank you, Jerome. Before you complete your opening argument, do you address the leave to amend the short case? Well, yes, Your Honor, I think that the first we were permitted leave to amend by the court and and tried to address what we understood to be the limitations and provided an amendment, which Judge Shubb, when he looked at focused solely on the cohabitation question and the definition of cohabitation and whether Joseph essentially dividing his time among his three siblings and also at times spending the night outside qualified as a cohabitant. And he found that he was he we hadn't shown that proximate to his death. And I don't know what that meant, whether the night before he was killed or the week before that in that short period of time that Joseph had lived either with with Robert or with Vern or with Deborah. And what we would like to be able to show if that's what is really of concern to Judge Shubb is go into those those those days, those specific days or hours before his death and talk about precisely what was happening as far as the siblings knew. So if that is the situation, then we would certainly want to be able to provide that additional detail for for Judge Shubb so that he could conclude that this was an intimate relationship. And if he felt it had to happen that way, that we will call that cohabitation. Mr. Merrill, aren't you bound by the law of the case to go for cohabitation? Well, I, I don't read the court's decision that way, Your Honor. I've read it over and over and over again. And I think the theory was that that that cohabitation was required under the first the first measure of entitlement to sue as listed by the court in Rotary. So therefore, we focused on what cohabitation meant. And we concluded that Joseph did, in fact, cohabit with his siblings. He didn't live with anybody else. So it's almost by by the process of exclusion, one would conclude that that was qualified cohabitation. But I think that what what really makes sense to me is is to look at, well, how could cohabitation that that requirement be applied practically? One would have to look at, well, gee, if a son or daughter went away to college, was that child still cohabiting? If that child went into the Navy or the Army or even into a mental hospital for perhaps a prolonged period of time, did that break the bond of cohabitation? And our view is that, no, it would not. That what you're really looking at is cohabitation as a stand in for the intimate relations, which has to be demonstrated to qualify for First Amendment protection. So that's why we think that either you find that Joseph Mann did, in fact, cohabit based on the facts that were provided in the amended complaint and remand this case to proceed either to through through motions. I don't know that any further amendment is necessary, but we could provide such additional detail. Normally that detail is is discerned through through deposition and other forms of discovery. But we could plead we could plead all that detail if that's what the court wanted or it proceeds then to further litigation and ultimate trial if if it's not disposed of on summary judgment. Do you have any case where you should listen to more than one person? I don't understand. Well, it would certainly be understandable if the three people live together, then they'd be cohabitating. And if they if they happen to have three adjacent homes and the the brother stayed a few nights in each of their homes, you would say he's cohabitating with them all. I would say that in any event. So I don't think that that just because there's a multiplicity of homes that that would preclude a finding of cohabitation. I can't see what time I have left because my screen is blank. You have about 45 seconds. Well, I'd like to reserve those 45 seconds. Thank you. Thank you, your honors. You're welcome. Your Honor. John Whitesides for Applebee's. John Tennis and Randy Lozoya. I can't see Mr. That is correct, your honor. I'm on by telephone. OK. Also, I was able to generally follow the questions from each member of the panel, but there is an echo. And so if you ask me a question, don't be surprised if I have to ask you to repeat it. I think there are some fundamental problems with the plaintiff's position that Mr. Marin's argument did not address. And when we look at the ward case where this circuit held that there is no sibling protection under the due process clause. And then we look at what the prior panel did in this case by saying, well, sibling protection would have to require cohabitation. Excuse me. Excuse me, counsel. Yes. Right there. Forgive me for interrupting. Go ahead. Where does the prior panel opinion say that? Echoing anything. It says that, your honor, at the. At ER 58. Yes. At ER 58. It says that ward necessarily rejected any argument that adult non-cohabitating siblings enjoy a right to intimate association. Correct. And then it's. Correct. And since we do have the on the same page, the panel saying that we're going to analyze any First Amendment right, the same as the liberty right under the due process clause, then that cohabitation requirement would apply regardless of what theory is invoked. Right. So that's the closest I can get to. I think you have to make that inference. And then I think what you get from this opinion, going back to Judge Lasnik's question about law of the cases, we've got case law authority, it seems to me, that tells us what does not suffice. Right. At least for the 14th Amendment. And then if we if we use your glue, the earlier statement, then we can maybe infer that the same standard is true for the First Amendment association claim. But I but I I don't know that that it's why I pose the question to opposing counsel. Does he have to have cohabitation? These cases tell us what does not suffice, what is not sufficiently close. Does he have to have cohabitation to get across the line or can he put that together? Could you make a sufficient showing with other facts? No, Your Honor. He has to have cohabitation. And here's why. The one thing that the Supreme Court and the circuit has been consistent about, and perhaps the only thing, is that this is a liberty interest. It's about the freedom to make a choice that is of such a fundamental nature that it receives constitutional protection. So with spouses, they made the fundamental choice to marry. With parents, they made the fundamental choice to have children. And there are other cases where the court explores the different aspects of this, whether it's contraception, abortion, how to raise the child religiously, whether to send it to private school or public school. And so we have all of these fundamental choices. We don't have that with siblings. Siblings do not choose each other. So when Roberts and Rotary Club talk about the freedom to enter into a relationship, they're talking about a choice. And there is no choice with siblings. The choice is made for the sibling by the parents. So because there's no protection, i.e. no choice, there has to be some other way for them to reach a level of protection. And the only other choice that's available to them, because they can't marry and they can't have children, at least not legally, is to cohabit. So if the brothers cohabit, brother and sister, siblings, then they've made a choice which, under Moore v. East Cleveland, rises to a level of constitutional protection. So there the court goes beyond the nuclear family and says extended grandparents, grandchildren, that counts. Not because the grandparent-grandchild relationship itself is protected, there's no choice there, but because they're choosing to cohabit. So the answer to your question is yes, they must choose to cohabit, otherwise there is no choice here to protect. Now in this case, we didn't really have a choice to cohabit. Judge McCampbell, could I ask one follow-up question right there? Forgive me for interrupting. No, go ahead, Judge Kristen. When you came to your conclusion, I think your conclusion is premised on the MEM-DISPO issued in this case, as opposed to other controlling case law. Is that right? No, it would be both. Because if you look at Roberts and you look at Rotary Club, they're talking about the choice to enter into and maintain. Yeah, I've read those cases carefully, thank you. I just wanted to make sure, going back to Judge Lassner's question, whether you're relying on law of the case or the United States Supreme Court's case law. You've answered my question. Yes, primarily law of the case, but to the extent it didn't apply, then I would expand it to the other cases as well. Counsel, Judge Gould with a question. Yes, Judge Gould. Related to what Judge Kristen asked, why can't there be a choice with a group of siblings that's three or even four, if they've made a choice to let a sibling rotate living among them? Well, the choice would have to be mutual, Your Honor. In other words, you have to have both parties to the cohabitation choosing it. And we don't really have that here. What we have is, according to counsel's statements at the motion to dismiss hearing, the decedent continued to leave. He wanted to be alone. He did not want to cohabit. And they would go out and search for him and, quote, bring him back to whichever place they chose for him to be, and then he would tire of that and leave again. And then it would repeat itself over and over. The word they used was often. So I don't see that there was a choice to cohabit made that was mutual. The siblings were trying to look out for him, trying to take care of him, but he didn't want to be living with somebody else. He wanted to be out on his own. So we have another fundamental choice problem here that is why we're not reaching a level of Moore versus East Cleveland, where the extended family does choose to live together and are living together continuously at the time that they're cited for violating the ordinance. I don't know. It seems to me, counsel, that that argument might cut against you. I'm just imagining a jury hearing how difficult this mental illness was for his siblings and the fact that they were choosing. I'm just trying to play devil's advocate so you have an opportunity to respond. But the fact that they were going out of their way to go find their brother and continuing to bring him home so that he could rest and bathe and get cleaned up. You know, it could be that people would come to just the opposite conclusion, that his siblings were going out of their way to make the choice to keep him within the fold. What's your response to that, please? Well, I have two responses, Your Honor. The first is procedural, which is standing is an issue for the court, not an issue for the jury. The second point I would make is that the right that we're dealing with, you know, regardless of which amendment it can be pigeonholed into, is a right of choice. It's a liberty, a freedom. And so, however benevolent... Forgive me for interrupting again, but on that point, I think opposing counsel has been pretty clear. He's pursuing the First Amendment claim. So are you couching this now in terms of the 14th or First Amendment? Well, I'm in no better position now than I was then at the first panel argument. I mean, given the intra-circuit split, I can't ask this panel to say that the First Amendment requires expressive conduct. Because we've got IDK on the one hand and its progeny versus what happened recently with Keats v. Coyle. So I can't argue to you that First Amendment protection should be limited to expressive conduct as held by IDK. Because there's a split and you don't have the power to resolve the split. I can't ask you to do that. So I have to make my arguments consistent with the prior panel decision, which was to take kind of a neutral stance on that and say, well, okay, even if there is a First Amendment right, it's no greater than that under the Due Process Clause. And we're going to use the same analysis, assuming that there is a First Amendment right. Now, it becomes a problem for the plaintiffs because of the fact they abandoned the Due Process Claim. Because you can't proceed in this case on a purely a First Amendment theory without running into the split. So I realize that's not a very satisfactory answer to your question, but unfortunately, I don't know that there's any way around it. I cannot reconcile these different circuit decisions. And given that there's an intra-circuit split, en banc is the only way to resolve it. Now, I think in this case, under this fact pattern, there are ways to resolve it without going en banc on the threshold issue of does the First Amendment apply to non-expressive conduct. The last question I think that was asked to Mr. Marin was about the three different households. The district court, and this is at the supplemental excerpts of record at page 17, made it very clear at the status conference that he was going to require an amended pleading to contain facts that, quote, describe the details of the relationship of them while he was residing in those households, including when and the circumstances that he resided in each of the households. So there was absolutely a specific directive from the district court prior to the amended complaint to give that kind of detail. And that never occurred. And now in oral argument, for the first time, we're hearing some detail in that regard. But as we pointed out most recently in the Rule 28J letter, you can't do that for the first time on appeal. They needed to run that past the district court, either in the amended complaint or in the opposition to the motion to dismiss, or belatedly at the hearing on the motion to dismiss, or even on a Rule 60B1 motion, and not for the first time in their opening brief or at oral argument on appeal. So we do believe that the district court not only got a grant of discretion from the prior panel, but properly exercised its discretion by requiring not only facts that showed cohabitation, but that would be specific to each plaintiff, and not treat them as a collective mass, like they're some sort of a quasi-class. I think my time is up, Your Honor. So thank you. Thank you. Your time is up, but I have one question for you. Yes, Judge Gould. My question is this. Given the fact that when amendment was first done, the court had stated no standard of what factors would be significant in assessing cohabitation, why shouldn't the appellant have a chance to plead to amend again in light of what the district court said when the complaint was dismissed? Well, it wasn't the district court's burden to instruct plaintiff's counsel on how he should approach the law. That was for counsel to plead all the relevant facts and then argue how they sufficed under the law. So my answer to your question is the district court didn't have that obligation. If counsel had pled all the proper facts, then they could have been analyzed under whatever standard the district court chose to proceed under. Secondly, I think it's been overstated that the district court required those four factors. If you look at the exact language that the district court used, the district court said that the analysis should include those four factors. He did not limit it to those four factors. But again, he was very specific at the status conference that they needed a lot of factual detail as to each plaintiff. And that did not come out in the time frame proximate to the time of death. Only for prior years. Okay. Thank you, counsel. Thank you, your honor. Can we hear from Mr. Marin? Then, God, we're giving you two minutes. I failed on my side as a result of my own computer going into sleep mode. But in any event, I think Mr. Whiteside refers to choices as somehow the glue that unites these diverse cases. But I think a choice to remain intimate is another choice. And certainly in this case, these siblings demonstrated that choice when they remained in close contact with their brother who was admittedly mentally ill. And a different type of sibling than you would otherwise find who was healthy and could maybe express himself a little bit differently. So I think that Judge Christian's observation that there may be a little different standard when we're talking about relating to siblings who are mentally ill than would be applied to others. And although Mr. Whiteside suggests that we're adding things at this argument, I did not intend to add anything that wasn't in the record. I believed I was quoting or paraphrasing the specifics that had been identified in the first amended complaint. And we didn't have any more guidance that would have required us to plead anything more specific. And we thought we went overboard essentially by giving the history of the closeness of this particular family. Also, the idea that this is a liberty interest case when it's under the First Amendment, which is protecting the intimate relations and the association rights. I think Mr. Whiteside may have gotten that a little bit wrong. So I think that in this case, which is very important on the facts, that these siblings be permitted to go forward to actually bring out what happened and why to their brother. Facts which have not been revealed to this date. And that's why they need standing to proceed. Thank you, Your Honor. Thank you, counsel. Speaking, I do think I may have made a mistake because I didn't ask Sean Richmond to state his plan. One minute. Thank you, Your Honor. This is Sean Richmond for Appley City, Sacramento. And I would fully support the argument made by Mr. Whiteside in regards to the official law of the gate. I'd also like to just highlight the very clear and obvious public policy considerations at issue here. If the complaint were allowed to proceed, as the court is fully aware, he settled with the father of Mr. Mann almost three years ago. And had we even contemplated that siblings would have been proper plaintiffs in this matter, that negotiation would have been entirely different. And Mr. Marron, in his opening argument, mentioned, well, why should there be a difference if siblings are living together or not or cohabitating or not? Well, one, that is the law of the case, and that was put forth by the prior panel. But two, it is necessary to have some line of demarcation, as it were, so that a defendant does know and is aware of who might be that proper plaintiff. So I think that the first panel recognized that in its issuance of the law of the case, and that is what applies here. And Judge Hub was very explicit in requiring detail regarding that cohabitation, and that simply was not provided. Counsel, Judge Gould, I don't know if the courtroom deputy can hear me, but the clock here on my screen has been frozen at 32 for like several minutes, you know, for more than a minute. I think Mr. Richman's probably used his time, but Mr. Richman, if you need another 30 seconds to conclude, we'll let you do that. That's fine, Your Honor. I think I made my arguments clear, so thank you. Okay, well, thank you very much. Now, Mr. Merritt, I asked you to do your rebuttal argument before Mr. Richman spoke, so although we've gone over time, I'm going to give you an extra 30 seconds if you need it. Well, Mr. Richman, thank you, Your Honor. First of all, Mr. Richman introduces something totally new, and that's his public policy question. And I think that maybe from the city's perspective, they'd like to know who all the claimants are before they enter into a settlement, but that doesn't determine what the law is. And the law in this case, they had an indication, certainly, that siblings could maintain a right to sue because there were other cases that had already concluded where siblings had, in fact, settled cases after an excessive force resulted in the death of a plaintiff. So at this point, I think that the best thing would be for the court to remand the matter, to reverse the judgment, remand the matter for further proceedings, whether that is the filing of more explicit allegations in a Second Amendment complaint or proceeding to due discovery and tee it up for a summary judgment where all those facts could be properly considered. Thank you. Thank you. Thank you, counsel. I apologize for my misstep on the stage of the various arguments. But at this point, the case of Mann versus Sacramento Police Department shall be submitted. And we thank all counsel for helping us out with our remote arguments. Thank you, Your Honor.
judges: Gould, Christen, Lasnik